**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JOHN R. WALKER**, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) 2:08-cv-992 |
| | ) **Electronic Filing** |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| Defendant. | ) |

<u>**MEMORANDUM OPINION**</u>

## I.    INTRODUCTION

Plaintiff John R. Walker brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for review of the final determination of the Commissioner of Social Security

("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title

II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  Presently before the court are cross-

motions for summary judgment based on the record developed at the administrative level.  After

careful consideration of the decision of the Administrative Law Judge ("ALJ"), the briefs of the

parties, and the entire record, it is clear that the decision of the Commissioner is supported by

substantial evidence.  Accordingly, Plaintiff's motion will be denied and Defendant's motion will

be granted.

## II.    PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on October 19, 2005, alleging disability as of May 31,

2005 due to a major depression, post traumatic stress disorder, sleep apnea, and hypertension.

(R.  49, 52-67.)  Plaintiff's date last insured for purposes of DIB was December 31, 2009. (R.

12.)  The state agency denied his claims on May 4, 2006.  (R.  34-37.)  A hearing was held before

ALJ James Bukes on December 5, 2007 where Plaintiff, who was represented by counsel, and a

vocational expert testified.  (R.  306-323.)  On February 14, 2008, the ALJ issued a decision

finding Plaintiff not disabled. (R.  11-26.)  On March 28, 2008, Plaintiff filed an appeal to the

Appeals Council, who denied Plaintiff's request for review on May 8, 2008. (R.  4-6, 7.)  The

instant action followed.

## III.    STATEMENT OF THE CASE

Plaintiff was born on January 4, 1948, making him fifty-seven years of age at the time of his asserted onset of disability and sixty years of age on the date of the ALJ's decision. (R  49.) Plaintiff finished high school and was in the military from 1967-1971. (R.  99, 308.)  Plaintiff's past relevant work includes working as a hand laborer in an industrial mechanical plant (1986-2004) and at Sony as an inspector (2004-2005). (R.  60, 309.)

On March 3, 2004, Plaintiff underwent a sleep study that indicated severe sleep apnea. (R.  262.)  Plaintiff's apnea hypopnea index was 61.[1] Id.  A treatment study on the following day showed that a 9 cm continuous positive airway pressure (CPAP) was effective in treating his sleep apnea. Id.  Plaintiff treated with the CPAP until he lost his job and medical coverage in the Fall of 2004.  (R.  264-65.)  His CPAP prescription was reinstated by the Veteran's Administration on January 4, 2005 with the same regime as he had treated with previously. Id.

On January 26, 2005, Plaintiff had an individual therapy session with Daniel Ziff, a licensed social worker. (R.  264).  Plaintiff discussed losing his job at the chemical plant after over eighteen years of employment. Id.  He stated that he had been making mistakes and was given warnings but was later fired for those mistakes.  During the same period, Plaintiff was diagnosed with sleep apnea and was falling asleep and having trouble concentrating at work.  He stated that the CPAP helped some. Id.  As to his emotional symptoms, Plaintiff indicated that he was very depressed, but denied feelings of suicide. Ziff assessed a GAF of 50.[2] Id.  Plaintiff

---

[1]An index used to assess the severity of sleep apnea based on the total number of complete cessations (apnea) and partial obstructions (hypopnea) of breathing occurring per hour of sleep.  These pauses in breathing must last for 10 seconds and are associated with a decrease in oxygenation of the blood.  In general, the AHI can be used to classify the severity of disease (mild 5-15, moderate 15-30, and severe greater than 30).  Brandon Peters, MD, Definition of AHI available at http://sleepdisorders.about.com/od/glossary/g/AHI.htm.

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest.   A GAF score of between 31-40 denotes severe impairment.  The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 51-60

(continued...)

concurrently treated with Dr. Joseph Fetchko, Ph.D.  At his January 28, 2005 visit, Plaintiff denied suicidal or homicidal ideations, reported an improved mood, and indicated that he was having trouble with his energy level but that his sleep was less disrupted. (R.  263).  Plaintiff told Dr. Fetchko that "Vietnam never goes away and he thinks about it every day." Id.  Plaintiff was continued on bupropion for his depression and viagra for his erectile dysfunction. Id.  A GAF of 64 was assessed by Dr. Fetchko. (R.  256).

On February 17, 2005, Plaintiff underwent an endocrinology consultation with Dr. Michael Radin for his erectile dysfunction. (R.  199-201, 259-260).  Plaintiff indicated that his erectile dysfunction had been present for at least ten years and that he had some success with Viagra. Id.  Dr. Radin indicated that Plaintiff's testosterone levels were normal and that there was no vascular or neurological cause of the dysfunction. (R.  259).

Plaintiff had individual therapy sessions with both Dr. Fetchko and Mr. Ziff on March 16, 2005. (R.  257-258).  During his session with Dr. Fetchko, Plaintiff reported no suicidal or homicidal ideations and that his mood had improved on bupropion. (R.  257).  Plaintiff described an incident where he blacked out in a car while using alcohol. Id.  He reported making it to a friend's house where the police found his car parked on the curb.  Plaintiff stated that this incident scared him and that he was abstinent after that event. Id.  Plaintiff further reported that he felt that the Iraq War was progressing similarly to Vietnam.  Dr. Fetchko indicated that Plaintiff processed some of his anger, had fair interest, and did not require treatment for his episodic alcohol abuse.  Plaintiff was diagnosed with posttraumatic stress disorder (PTSD).  Id.

---

[2](...continued)
may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41-50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .;  of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." Id.

In his session with Mr. Ziff, Plaintiff indicated that he was working for a temporary agency as an inspector. (R. 257). He reported the same blackout incident stating that he would remain abstinent. Mr. Ziff warned him of the dangers of taking medications while drinking and noted that Plaintiff should get in touch with the White Oaks Veterans Center for counseling and job opportunities. Mr. Ziff assessed a GAF of 50. (R. 258).

Plaintiff underwent dual therapy sessions again on May 16, 2005. (R. 140-141.) In his session with Dr. Fetchko, Plaintiff reported that he was upset about losing his job and felt that the problems he was having at work were not dealt with properly. (R. 255). Dr. Fetchko indicated that Plaintiff was able to challenge his cognitive distortions that nothing had gone right in his life since Vietnam. Id. Upon mental examination, Dr. Fetchko reported that Plaintiff was depressed, had a restricted affect, and had a partial response to Wellbutrin (bupropion). Id. Plaintiff reported sleeping 5-6 hours per night and that he was without his CPAP machine. Id. Dr. Fetchko added citalopram to augment the bupropion. Plaintiff was also offered information on Compensated Work Therapy (CWT) through the Veteran's Administration. (R. 256). In his session with Mr. Ziff, Plaintiff indicated that he had no money for food or utilities and was given information on job related services. Mr. Ziff reported that Plaintiff was very depressed but was not suicidal. Id. Mr. Ziff assessed a GAF of 45. (R. 125, 254-55).

On May 18, 2005, Plaintiff saw Sheila Walsh from the sleep lab. (R. 128). Ms. Walsh indicated that they had ordered CPAP equipment for Plaintiff in March, but he had never called to have it delivered. Plaintiff was told to call and have it delivered. Id. On June 1, 2005, Plaintiff saw Dr. Charles Atwood to review his therapeutic sleep study results. The test revealed an Epworth Sleepiness score at 17.[3] (R. 127). On June 3, 2005, a pressure change was ordered to Plaintiff's CPAP from 9cm to 13cm due to his test results. (R. 191).

Plaintiff attended group therapy on July 19, 2005 with CRN, Deborah Young and Dr.

---

[3] The Epworth Sleepiness Scale is a subjective test used to determine the level of daytime sleepiness. A self-reported score of 10 or more is considered sleepy. A score of 18 or more is considered very sleepy. University of Maryland Medical Center Sleep Disorder Center, Epworth Sleepiness Scale, available at http://www.umm.edu/sleep/epworth_sleep.htm.

Fetchko. (R. 126). Ms. Young reported that Plaintiff had received unemployment after a hearing and had stated that he "really [did] not want to work." (R. 126). Plaintiff was confronted with playing a role in losing his previous jobs, but did not want to hear insinuations of that sort. Id. He acted ambivalent towards getting job counseling and indicated that he had not filled out any job applications in the last two weeks. (R. 126). Plaintiff would not admit that his behavior was problematic to him finding work and he stated that "he never liked working, but had to do it." Id. Ms. Young and Dr. Fetchko noted that Plaintiff was holding up well and had no complaints about sleeping, but needed to work on his level of functioning as he had become convinced that nothing was in his control. Id. On June 21, 2005, Plaintiff met with Ms. Young for a review of his individual therapy. He stated concerns related to his homeless status and unemployment. He was encouraged to keep looking for work. (R. 125). Dr. Fetchko assessed Plaintiff with a GAF of 60. (R. 122).

On August 14, 2005, Plaintiff was admitted to emergency care for continuing pain across his chest. (R. 123-124). Dr. Christopher March ordered an out-patient stress test and an electrocardiogram. The electrocardiogram was normal with normal sinus rhythm and normal sinus arrhythmia. (R. 1 30).

Plaintiff returned for dual therapy sessions on September 1, 2005. (R. 121-123). In his session with Dr. Fetchko, Plaintiff reported that he was not sleeping well and was having problems with irritability. He indicated that he had not used alcohol since his last visit. Id. Dr. Fetchko increased Plaintiff's citalopram and added trazadone for sleep. It was recommended that Plaintiff talk to CWT, the Office of Vocational Rehabilitation (OVR), and the Vietnam Veterans Leadership Program (VVLP). Id. In his session with Mr. Ziff, Plaintiff indicated that he felt invalidated by Dr. Fetchko in his struggle to find work. Plaintiff stated that he was trying to protect himself with unemployment and a non-service connected disability pension (NSC) in case there were no jobs available. Plaintiff did agree that he would make more money if he found work. (R. 123). On September 20, 2005, Plaintiff was contacted by John Erskine, a vocational rehabilitation expert about the CWT program or potentially training or retraining with the OVR. (R. 121). Dr. Fetchko indicated Plaintiff's request for a referral to CWT on September 21, 2005.

5

He also increased Plaintiff's trazadone due to trouble sleeping. (R. 119).  Dr. Fetchko assessed Plaintiff with a GAF of 55. (R. 116).

On September 21, 2005, Plaintiff was examined by Colleen Paul, RN, a pulmonary nurse practitioner/physician's assistant. (R. 120).  Plaintiff reported that he was only using his CPAP machine 3-4 hours per night because the air was too cool and complained of being tired all day due to non-compliance. Id.  Plaintiff was counseled on using the heating element on his CPAP and the need for better compliance. Id. On examination, Ms. Paul indicated Plaintiff's lungs were clear, he had no leg edema, no lymphadenopathy, and a small crowded airway. Id.  Plaintiff requested a consult for a possible surgical intervention for his sleep apnea. Id.

On September 27, 2005, Plaintiff met with George Perkosky, M.Ed., for a CWT consult. Plaintiff stated that he was receiving unemployment compensation and wanted to know what affect income would have on that. He further indicated interest in finding work in warehouse production.  (R.  118, 186-187).

Plaintiff underwent a psychological evaluation by Dr. S.Huegel, Ph.D, at the Veteran's Administration on October 11, 2005. (R. 98-101).  Plaintiff indicated that he was raised by foster parents who were strict but good parents and never saw his siblings. (R. 98).  He reported that he was alienated in school because he was the only African American, but got along well in superficial relationships. Id.  He volunteered to go to Vietnam, but ended up under friendly fire which caused issues with trust.  He reported no traumatic experiences or legal difficulties when he returned.  He indicated he was divorced with three children and that he was not close to his children but had no acute difficulties with them. (R.  99.)  Plaintiff's subjective complaints included depression; depressed mood every day; markedly diminished interest and activity; significant weight gain from comforting with food; very disturbed sleep; little sense of self-worth; some difficulty concentrating; episodic suicidal ideation and intent when house was sold at auction; some symptoms of PTSD including disturbing and intrusive memories of his time in Vietnam and occasional nightmares; exacerbation of his respiratory problems when watching events of the Gulf War; pessimism about the future; and irritability. (R. 100).

Upon mental status examination, Dr. Huegel indicated that Plaintiff was 5'9", 310 pounds

with good grooming and hygiene; was alert and oriented; had spoken language that was fluent, coherent, goal-directed and normal in rate with no latency in responding; good social skills with good cooperation; abilities as a historian and informant that were intact; some irritability with a self-reported depressed mood; laughed and smiled at appropriate times in the interview; had no psychotic or obsessive-compulsive behaviors; no impulse control problems; and intact insight and judgment. (R. 100).  Dr. Huegel diagnosed Plaintiff with major depression, recurrent, moderate to severe and assessed him with a GAF of between 60-65. (R. 100-101).  Dr. Huegel opined that "[t]he veteran is competent to manage his funds, has a good understanding of finances, and no history of financial mismanagement.  He has been treated for depression and continues to meet criteria for the same.  The severity of the veteran's symptoms do not render him unemployable. The veteran is able to work in [a] competitive environment and has done so for many years." (R. 101).

On October 17, 2005, Nurse West and Dr. Dresser evaluated Plaintiff for a "non-service-connected disability pension."  Plaintiff reported that he had sleep apnea with the use of a CPAP machine, asthma, bilateral hearing loss decreased with bilateral hearing aids, and was on advair, trazadone, viagra, flunisolide, citalopram, aspirin, bupropion, and ibuprofen. (R. 97).  Plaintiff also reported headaches that lasted 1-2 hours without medication, occasional tinnitus twice per month, occasional difficulty swallowing, occasional hemorrhoids with bleeding during bowel movements, and occasional edema to the lower extremities, feet and ankles with prolonged weight bearing. Id. The review of Plaintiff's systems was grossly normal.  Dr. Dresser reported that Plaintiff was pleasant, appropriate, and well-groomed; had good eye contact and answered questions appropriately; and had no lower back complaints or obvious lower back problems. Id. Dr. Dresser indicated that Plaintiff's most recent labs were normal, chest x-ray was normal, and ECG was normal.  (R. 98, 130-131).

On October 19, 2005, Plaintiff completed a Disability Report indicating that he was living at the home of a friend who took him to appointments and paid his bills. (R. 60).  Plaintiff also reported that he did not do yard work or cook; did not grocery shop; could not climb steps because of shortness of breath and foot pain; could dress and shower without resting; could not

make the bed without resting; stayed to himself because he did not like to be bothered; did not respond well to criticism and authority; had difficulty going out in public, had difficulty understanding and remembering directions; could report to work on time and had good attendance but would not be able to keep up with work; and could not concentrate on work and had trouble getting along with co-workers and supervisors. (R. 60-64).  As to his physical symptoms, Plaintiff reported his fatigue was worst in the mornings and that his medication relaxed him sometimes; he took ibuprofen for headaches that would spread to his neck; he took trazadone to sleep; he gained a lot of weight; and he took pain medication that would relieve his pain for eight hours. (R. 64-67).

Plaintiff attended individual therapy with Daniel Ziff on October 27, 2005. (R. 117).  Mr. Ziff noted that Plaintiff was looking for work and thinking about moving. Id.  He indicated that Plaintiff's mood was apathetic, lethargic, and depressed, but he was not complying with his CPAP, which was contributing to his mood. Id.  Ziff assessed Plaintiff with a GAF of 55. Id.  In his session with Dr. Fetchko on October 28, 2005, Plaintiff reported that he was having some trouble maintaining sleep because he was getting used to the mask for the CPAP machine.  Plaintiff further reported that he was pursuing job options with a job service but was not able to find work and had looked into CWT but indicated that he would not be able to keep his car if he were to utilize that program. (R. 117).  Dr. Fetchko opined that Plaintiff's interest in the process was fair. Id.  Upon mental examination, Dr. Fetchko noted that Plaintiff's mood was euthymic and that he was less angry and focusing more on problem solving.  Dr. Fetchko assessed Plaintiff with a GAF of 57.  Id.

Plaintiff missed two weight management program evaluations on November 7, 2005 and November 17, 2005, respectively. (R. 115-116).  Plaintiff underwent a surgical consultation with Dr. Ryan Soose for his sleep apnea problems on December 1, 2005. (R. 115).  Dr. Soose indicated that the examination was normal except for the small tonsils and uvula, which were causing the oropharynx to be overcrowded. Id.  Dr. Soose reported that "[b]ecause of his relatively small tonsils and uvula compared to his large base of tongue, as well as his obesity, he

has a low likelihood of success from a uvulopalatal pharynoplasty."[4] Id.   It was recommended that Plaintiff continue with his CPAP machine and lose weight.  Id.

On December 8, 2005, Plaintiff attended individual therapy with Mr. Ziff. (R. 114). Ziff indicated that Plaintiff's mood had improved and that Plaintiff was looking into moving to North Carolina to look for work and was hoping for an NSC pension to get him by until then. (R. 115). Plaintiff reported that the medications helped with his mood and especially his depression, but that his sleep was still not good. (R. 114).  In his session with Dr. Fetchko, Plaintiff reported feeling disconnected from family and out of place.  Dr. Fetchko reported that Plaintiff was staying away from alcohol, had a stable mood, and was sleeping relatively well at night. (R. 113).

On January 12, 2006, Plaintiff was awarded a NSC pension through the Department of Veteran Affairs. (R. 270-273).  The decision stated that Plaintiff was disabled due to major depression, sleep apnea, hypertension, asthma, and bilateral hearing loss. (R. 275).

 Plaintiff was seen as a new patient by family practitioner, Dr. Matt Freuhling, on January 30, 2006 . (R. 109-110).  At the examination, Plaintiff requested a referral to the weight management clinic, audiology for new hearing aids, and optometry for new glasses. (R.109.) Plaintiff reported that nothing else was bothering him. Id.  Dr. Freuhling noted that Plaintiff was in therapy for PTSD and depression which was stable at the time; had hearing loss and wore glasses; was wheezing occasionally with asthma; and had sleep apnea, obesity, hypertension and erectile dysfunction. (R. 109-110).  Plaintiff had normal testosterone levels and a normal colonoscopy. (R. 110).  Due to elevated blood pressure on several occasions, Plaintiff was placed on hydrochlorothiazide (HCTZ).  He was also placed on Flunosolide with the goal of reducing his albuterol inhaler use for asthma. Id.

On January 30, 2006, Sandra Simpson, LPN, entered a prevention note for Plaintiff noting that his mood disorder and PTSD screens were negative. (R. 112-113). Simpson noted that Plaintiff had no barriers to learning and no values affecting healthcare and education. Id.  On

---

[4]A surgical resection of unnecessary palatal and oropharyngeal tissue in selected cases of snoring, with or without sleep apnea. Stedman's Medical Dictionary, 1406 (28th Ed. 2006).

February 15, 2006, Plaintiff was given a BP monitor to use at home. (R. 109.)  On February 22, 2006, Plaintiff was seen by Dr. Edward Savarno, OD for blurry vision. (R. 107-108, 177-180). Dr. Savarno noted that Plaintiff's glasses had not been changed in a long time. Upon examination, no holes, tears, or detachments in the eyes were noted. Id. Plaintiff was issued a glasses prescription. Id.

Dr. Fetchko penned a letter on February 24, 2006 stating, "[t]he Veteran has been treated at the VA for major depression and multiple medical conditions. He has been deemed unable 'secdure [sic] and follow a substantially gainful occupation due to disability by the Veteran's Administration.' This was determined by the Veteran's Administration and support [sic] by the observations by his clinicians." (R. 107).  In his individual session with Dr. Fetchko on February 27, 2006, Plaintiff reported some confusion and increased anxiety.  Plaintiff indicated that he was having episodes that lasted a minute to a half an hour that included shortness of breath, a sense of impending doom and a lightheaded feeling.   Dr. Fetchko noted that Plaintiff did not meet the symptoms of panic attacks. (R. 105).  Dr. Fetchko opined that Plaintiff's ability to focus at work would be impaired considering the "constellation of his current conditions." (R. 105).  Dr. Fetchko increased Plaintiff's citalopram and decreased his bupropion and kept him on the trazadone at night. (R. 105-106).  Plaintiff was told to work on his problem solving skills and goal setting but Plaintiff did not feel able to do the CWT program. Id.  Dr. Fetchko indicated that Plaintiff was being treated for recurrent major depression and adjustment disorder with mixed emotions. Id.  Plaintiff was assessed with a GAF of 54. (R. 103).

On February 27, 2006, Plaintiff failed to attend his weight management program.  (106, 181).  Plaintiff attended individual therapy on March 22, 2006 with Dr. Fetchko. (R. 103).  Dr. Fetchko indicated that Plaintiff's mood was holding up but he was unsure about the future.  Id. Plaintiff indicated that he was in communication with his middle daughter and was working on challenging his negative thoughts and on his problem solving skills. Id.  Plaintiff was continued on citalopram and bupropion. Id.

On March 22, 2006, Plaintiff was examined by Maureen L. Wargo, a clinical audiologist, for his hearing problems. (R. 104-105, 175-176).  Plaintiff reported periodic tinnitus in both ears

that was not bothersome and occasional dull pain in both ears. Id.  Plaintiff indicated problems with hearing during daily activities like watching TV, meetings, telephone use, group situations, and listening to children. Id.  Ms. Wargo's audiological evaluation revealed mild to moderate sensorineural hearing loss in both ears.  Word recognition scores were good in the left ear at 84% and fair in the right ear at 72%. Id.  Plaintiff's hearing loss exceeded the adjusted population norms so hearing aids were ordered.  He had received hearing aids in the past but they had stopped working. Id.  Plaintiff was fitted for his hearing aids on April 27, 2006 and Plaintiff reported that "normal conversational speech was comfortable and easily understood." (R. 222). Ms. Wargo indicated that the prognosis with hearing aids was good. Id.

On March 24, 2006, Plaintiff presented to Dr. Diane Johnson, a podiatrist, complaining of blisters on his feet that he indicated had been present for thirty-five years. (R.101).  On examination, Dr. Johnson found palpable pedal pulses bilaterally and good vibratory sensation bilaterally. Id.  Plaintiff was diagnosed with onychomycosis[5] with associated discolored, dystrophic, and deformed toenails and pes planus, hallux rigidus deformity bilaterally (flat feet). Id. Dr. Johnson performed a debridement of the mycotic nails and prescribed a combination therapy of dilute betadine cleanse followed by drying the area well and applying lamisil cream twice daily. (R.102).  She also prescribed custom molded orthotic devices for Plaintiff's flat feet. Id.

Dr. Roger Glover, Ph.D., reviewed Plaintiff records on May 1, 2006 and opined that Plaintiff had an adjustment disorder with sleep disturbance, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating or thinking. (R. 138). Dr. Glover indicated that Plaintiff had mild restrictions in the activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties maintaining concentration, persistence, and pace, and no episodes of decompensation. (R 145.)  Dr. Glover opined that Plaintiff was moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions,

---

[5]Very common fungus infections of the nails causing thickening, roughness, and splitting. Stedman's Medical Dictionary, p. 1367 (28th Ed. 2006).

maintain attention and concentration for extended periods, respond appropriately to changes in the work setting, and to make realistic goals or plans independently of others.  In all other facets, Glover indicated that Plaintiff was not significantly limited. (R.148-149).

On May 5, 2006, Plaintiff attended individual therapy with Dr. Fetchko. (R. 221).  Dr. Fetchko reported that Plaintiff's mood was holding up, his interest level was fair, his anxiety was under fair control, he had a bit of irritability, and was avoiding situations that might bring out his anger. Id. On June 22, 2006, Plaintiff saw Dr. Fetchko again for therapy. (R. 220).  Dr. Fetchko reported that Plaintiff's thought process was logical and goal directed, mood was euthymic, affect was full, and speech had normal volume and rate. Id.  Plaintiff's insight and judgment were intact and his interest level was fair. Id. Dr. Fetchko maintained Plaintiff's medication levels. Id. At individual therapy on August 3, 2006, Plaintiff stated that he was concerned about the war in Iraq. (R. 219).  Dr. Fetchko reported that Plaintiff's thought processes were logical and goal directed, his mood stable, speech normal, insight good, and judgment intact. Id.  Plaintiff's interest level was fair. Id.  On October 6, 2006, Plaintiff reported that his days were not structured and that he was watching "turner classic television" all day and not exercising or doing anything outside the house.  Dr. Fetchko noted that Plaintiff was 15 minutes late to a 25 minute appointment and was devaluing treatment. (R. 218).  Dr. Fetchko reported that Plaintiff's thought process was logical and goal directed, mood stable, affect restricted, speech normal, insight good and judgment intact.  Plaintiff's interest level was fair and Dr. Fetchko indicated a need to get the veteran to see himself as the biggest factor in determining the quality of his life and that his behavior was counterproductive. Id.

On October 13, 2006, the pressure on Plaintiff's CPAP was increased to 15 cm due to complaints of sleepiness. (R. 169-170, 217).  Plaintiff failed to attend the weight management program on November 11, 2007. (R. 216).  On December 8 2006, Plaintiff reported losing both hearing aids and Ms. Wargo indicated that he needed to come in for new molds. (R. 215).

At his individual therapy session on December 12, 2006, Plaintiff reported that he was watching his weight and that it was coming down. (R. 215).  Plaintiff's thought process was logical and goal directed, mood was euthymic, affect was full, and speech had normal volume

and rate. <u>Id.</u>.  Plaintiff's insight and judgment were intact and his interest level was fair. <u>Id</u>. Plaintiff was assessed with a GAF of 54. (R. 210).

On January 10, 2007, Plaintiff saw his primary care physician, Dr. Freuhling. (R.213-214). Dr. Freuhling noted that Plaintiff was still being seen for PTSD/Depression which was stable.  Plaintiff complained of nasal congestion and reported that he was still using his short acting inhaler twice a day. He further reported that he was only using his CPAP three times a week due to congestion. (R. 213).  Plaintiff was given a prescription for a blood pressure cuff for home use and samples of nasal spray for his congestion. (R. 214).

On January 18, 2007, Plaintiff reported feeling lonely when his ex-wife moved his children to Florida many years before. He also reported trouble sleeping. Dr. Fetchko indicated that Plaintiff's through processes were logical and goal directed, mood was euthymic, affect full, speech normal, insight good and judgment intact, and interest level fair. Plaintiff was taken off of trazodone and placed on miratzapine. (R. 210).  On March 16, 2007, Plaintiff indicated he was feeling more calm and sleeping better on mitrazipine.  Dr. Fetchko reported that Plaintiff's through processes were logical and goal directed, mood was euthymic, affect full, speech normal, insight good and judgment intact, and interest level fair. Plaintiff was assessed with a GAF of 52. (R. 208-209).  At his session on May 4, 2007, Plaintiff reported that the medications were buffering his mood, but he was having trouble sleeping due to seasonal allergies.  He also indicated that the CPAP was helpful but contributed to his nasal irritation. Dr. Fetchko reported that Plaintiff's through processes were logical and goal directed, mood was euthymic, affect full, speech normal, insight good and judgment intact, and interest level fair. (R. 301).

On June 7, 2007, Plaintiff reported that his bonds with his children and extended family had been renewed but that he still preferred being alone.  He also indicated that his asthma was limiting him.  Dr. Fetchko reported that Plaintiff's through processes were logical and goal directed, mood was euthymic, affect full, speech normal, insight good and judgment intact, and interest level fair. (R. 299-300).  At therapy on July 19, 2007, Plaintiff discussed his hearing loss from Vietnam and his plans to renew efforts to lose weight.  Dr. Fetchko reported that Plaintiff's through processes were logical and goal directed, mood was euthymic, affect full, speech normal,

insight good and judgment intact, and interest level fair.  He assessed Plaintiff with a GAF of 54. (R. 297-298).

On July 25, 2007, a prevention note was entered into Plaintiff's record indicating that he was reporting headaches with a pain intensity of four.  Plaintiff stated that the headaches were successfully treated with Motrin. (R. 295).  On the same date, Plaintiff had a primary care visit. His blood pressure was elevated, but he reported that his home readings had been normal. Plaintiff was counseled on obesity and eating well. (R. 296).

At his individual therapy session on August 31, 2007, Plaintiff reported that his breathing problems were limiting him and Dr. Fetchko encouraged him to reschedule a pulmonary function test which Plaintiff had previously cancelled.  Plaintiff further indicated he was sleeping well. Dr. Fetchko noted that Plaintiff's thought processes were logical and goal-directed, mood was euthymic, affect full, speech normal, interest level fair, and insight and judgment intact. (R. 294). Dr. Fetchko assessed a GAF of 54. Id. On October 11, 2007, Plaintiff noted  he was having more trouble with sleep, stated that his interest in things was good, he was not feeling depressed, and that "he would take overtime if given the chance at work." (R. 292).  Dr. Fetchko indicated that Plaintiff's thought processes were logical and goal-directed, mood was euthymic, affect full, speech normal, and insight and judgment were intact. Id.  Dr. Fetchko assessed a GAF of 54. Id.

At the hearing on December 5, 2007, Plaintiff testified that he was living by himself. (R. 307).  As to his previous work, Plaintiff testified he had been an air traffic controller in the military, a hand laborer in an industrial mechanical plaint, and an inspector at Sony. (R. 307-308).  Plaintiff testified he left his work as a hand laborer because he fell asleep on the job due to sleep apnea and that his job at Sony was mainly a standing job. (R. 309-310).  He noted he was wearing hearing aids and was on albuterol and asthmanax for asthma. (R. 310, 314).  Plaintiff stated that he slept two to three hours per night, did not cook much, took naps during the day, could walk about a block and then had to use his puffer, and weighed about 315 pounds. (R. 315-318).  Plaintiff also testified that he could not drive long distances due to sleep apnea or his medication, but was not sure which was actually causing the problem. (R. 312).  As to other issues, Plaintiff testified that he was on non-service connected disability through the Veteran's

Administration and had filed race discrimination claims against his past two employers but could not see them through because he had signed a last chance agreement.  (R. 311-13.)

In his opinion, the ALJ concluded that Plaintiff had not been under a disability as defined in the Act from May 31, 2005, through the date of the decision.  (R. 26).  The ALJ determined that Plaintiff had the following medically determinable "severe" impairments: asthma, sleep apnea, obesity, depression, and PTSD. (R. 14).  The ALJ noted Plaintiff's hearing loss but indicated that it had a "minimal effect on his ability to perform basic work activities." Id.  He also determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 14).  He further found that Plaintiff had the residual functional capacity to engage in medium work with the additional limitations of the need to avoid concentrated exposure to dust, fumes, odors, and gases. (R.19).  In addition, he limited Plaintiff to simple instructions and stated that Plaintiff needs to avoid changes in the work setting. Id.

## IV.    STANDARDS OF REVIEW

The Commissioner's findings and conclusions leading to a determination that a claimant is not "disabled" must be supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Stunkard v. Secretary of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988).  The task of this court in reviewing the decision below is "to determine whether there is substantial evidence on the record to support the ALJ's decision."  Burnett v. Commissioner of Social Security, 220 F.3d 112, 118 (3d Cir. 2000).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000)(quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).

As the fact finder, the administrative law judge ("ALJ") has an obligation to weigh all the facts and evidence of record and may accept or reject any evidence if the ALJ explains the reasons for doing so.  Plummer, 186 F.3d at 429.  This includes crediting or discounting a claimant's complaints of pain and/or subjective description of the limitations caused by his or her impairments.  Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Hartranft v. Apfel, 181

F.3d 358, 362 (3d Cir. 1999). And where the findings of fact leading to the decision of the Commissioner are supported by substantial evidence, a reviewing court is bound by those findings, even if it would have decided the inquiry differently. Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2000). But where a review of the entire record reveals that the Commissioner's decision is not supported by substantial evidence, the court has an obligation to reverse the decision and remand with direction to grant benefits or conduct further proceedings. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984). A remand with direction to grant benefits is appropriate only when substantial evidence on the record as a whole indicates the claimant is disabled and entitled to benefits. Id. at 221-22.

## IV.   DISCUSSION

Plaintiff argues that the ALJ's Residual Functional Capacity (RFC) determination stating he was capable of performing medium work was not supported by substantial evidence. Plaintiff additionally suggests that the ALJ's hypothetical question to the vocational expert did not include all of Plaintiff's readily determinable impairments. In support of these arguments, Plaintiff contends that: 1) the ALJ erred in considering Plaintiff's last job as an inspector as medium work; 2) the ALJ erred in determining that Plaintiff's sleep apnea and hearing loss were not severe; and 3) the ALJ failed to give the opinions of Plaintiff's treating psychologist and the Veteran's Administration substantial weight. In conclusion, Plaintiff asserts that he was capable of only less than medium work, which under 20 C.F.R. Pt. 404, Subpt P, App. 2, §202.00(c) would render him disabled. The Defendant posits that the ALJ's determination was supported by substantial evidence.

The ALJ did not err in determining that Plaintiff was capable of performing medium duty work with the additional limitations of the need to avoid concentrated exposure to dust, fumes, odors, and gases and to only be subject to simple instructions and few changes in the work setting. "'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's RFC represents the most, not the least, that a person can do despite his

16

or her limitations.  See Cooper v. Barnhart, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)).  In determining a person's RFC, an administrative law judge must consider all evidence of record. 20 C.F.R. §§ 404.1520, 416.920.  Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so.  Id.   As the court stated in Burnett, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"  Id. at 121 (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).  The ALJ determined that Plaintiff is capable of performing medium work, which physically  includes "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567.

As part of his argument, Plaintiff contends that the ALJ failed to accord the opinions of Dr. Fetchko and the Veteran's administration substantial weight, however, the ALJ properly discounted these opinions with Plaintiff's treatment records.  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)); see also Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989); Podedworney v. Harris, 745 F.2d 210, 217-18 (3d Cir. 1984).  Therefore, a treating physician's opinion is accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] record." Fargnoli v. Massarani, 247 F.3d 34, 42 (3d Cir. 2001).  Although not binding on a determination of disability by the SSA, the opinions of other agencies are also entitled to substantial weight if well supported. See Gifford v. Barnhart, 129 Fed. Appx. 704, 707 (3d Cir. 2005); Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1984).

Dr. Fetchko's letter from February 2006 stated as follows: "[t]he Veteran has been treated at the VA for major depression and multiple medical conditions.  He has been deemed unable

'secdure [sic] and follow a substantially gainful occupation due to disability by the Veteran's Administration.'  This was determined by the Veteran's Administration and support [sic] by the observations by his clinicians."(R. 107).  The Veteran's Administration opinion indicated, based on Plaintiff's treatment records of December 2, 2004 through September 27, 2005 and two consultative examinations, that Plaintiff was disabled due to major depression, sleep apnea, asthma, hypertension, and bilateral hearing loss. (R. 278).

A close consideration of each ground advanced by the ALJ for discounting these opinions demonstrates that his conclusions were correct and that Dr. Fetchko's letter and the decision of the Veteran's administration were not well-supported by the record.[6]  In discounting disability based on Plaintiff's mental impairments, the ALJ relied on the treatment records of Dr. Fetchko and the psychological evaluation performed by Dr. Huegel.  Dr. Fetchko's records tend to show that Plaintiff was suffering from, at most, moderate symptoms associated with his mental impairments.  GAF scores of 52-64 were assessed by Dr. Fetchko during treatment which indicate "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning" in the 51-60 range and "some mild symptoms" or "some difficulty in social, occupational, or school functioning" in the 61-70 range. (R. 103, 116, 117, 122, 210, 256, 292, 297-298).

Plaintiff was diagnosed with major depression and PTSD.  Despite his opinion letter, Dr. Fetchko's mental status examinations  indicated that Plaintiff's thoughts were logical and goal directed.  His mood was generally euthymic or stable and affect full.  A restricted affect was noted on only two occasions during  his nearly three years of psychological treatment records. Plaintiff noted improvement in mood and sleep pattern with his medications.  His interest in the treatment and job search process were listed as fair to good. (R. 105, 117, 208-209, 210, 220, 257, 292, 294, 297-298, 299 -300, 301).  At times, he expressed interest in returning to work and even in completing overtime if work was available. (R. 117, 292).  Dr. Huegel's examination

[6]In his decision, the ALJ determined that both the letter and the VA decision were "conclusory." (R. 23).

concluded in similar findings that support Dr. Fetchko's assessment of moderate symptoms including that Plaintiff had intact insight and judgment, was coherent and goal-directed, and had a GAF range of 60 to 65.  He further noted that Plaintiff's major depression was moderate.[7] (R. 98-101).

As another component to his determination, the ALJ concluded that Plaintiff's credibility was questionable, a finding supported by the records at issue. (R. 24). In July 2005, Plaintiff indicated that he "really [did] not want to work" and had "never liked working, but had to do it." This sentiment was later bolstered by his concern over what effect income from CWT would have on his unemployment collection. There is no evidence that Plaintiff ever participated in any of the government employment programs such as CWT, OVR, and VVLP, despite several referrals to those programs.  He did not continue past the consultation stage in any of them. On one occasion Plaintiff noted that he was not sending out job applications and on several occasions, Dr. Fetchko noted that Plaintiff was his own biggest obstacle to productive behavior and was devaluing treatment. (R. 125-126, 218).  In addition, Plaintiff indicated that he was attempting to obtain a NSC disability pension in case no jobs were available, not because he believed he was truly disabled. (R. 121-123).  The ALJ, therefore, properly considered this evidence on Plaintiff's lack of desire to work in support of his findings.

While the ALJ did not find Plaintiff disabled, it is evident that he did include well-supported limitations stemming from Plaintiff's mental impairments in his RFC assessment.  He limited Plaintiff to simple instructions due to his noted problems with concentration and to few changes in the work setting.  Plaintiff does not challenge the additional limitations imposed by the ALJ but instead suggests that there were other unspecified limitations that were severe and should have been addressed in the hypothetical question to the VE and the final RFC assessment. Based upon Dr. Fetchko's records, there is no evidence to support this assertion.  Considering the

_____

[7]Despite Dr. Huegel's opinion that Plaintiff was capable of work and was not disabled, the Veteran's Administration utilized his report in support of a finding of disability.  This clearly undermines the need to give the Veteran's Administration report substantial weight with respect to Plaintiff's mental impairments.

extensive explanations and support given by the ALJ for the weight given to Dr. Fetchko's letter, no error was made in rejecting the suggestion of disability that it contained.

The ALJ's rationale was similar with respect to Plaintiff's physical ailments, which the Veteran's Administration relied upon as part of their disability determination. The ALJ relied on Plaintiff's treatment records with respect to his sleep apnea, hearing loss, asthma, hypertension, and obesity in determining that he was not disabled.  Plaintiff was diagnosed with severe sleep apnea in March 2004 while he was still working and was placed on a CPAP machine.[8] (R.262). Plaintiff was without his CPAP machine for a period after he was fired from his job, but was ordered a new one by the Veteran's Administration. (R. 264-265).  The machine was ordered in March 2005, but was not received until May 2005, Plaintiff's alleged onset month, because Plaintiff never called to have it delivered. (R. 127-128).  A pressure increase was ordered when Plaintiff finally began using the new CPAP and another during later treatment. (R. 169-270, 191).

Plaintiff reported benefit from the CPAP when he was complying with treatment; however, Plaintiff was not generally compliant with the prescribed usage of the CPAP.  In September 2005, Plaintiff reported non-compliance with the machine due to the air being too cool.  He was counseled on using the heating element of the machine and the need for compliance was stressed. (R. 120).  In January 2007, Plaintiff indicated he was only using it three times a week due to congestion.  He reported nasal irritation again in May 2007.  The importance of compliance with CPAP usage was stressed to Plaintiff on both occasions and he was given nasal spray to treat his congestion. (R. 213, 301).  Other than sleepiness, no other problems relating to Plaintiff's sleep apnea were noted by his treating physicians.  The October 2005 examination by Dr. Dresser was normal and no difficulties with Plaintiff's sleep apnea were noted. (R. 98, 130-131).  At the surgical consultation in December 2005, Dr. Soose opined that Plaintiff was not a good surgical candidate, but that he should continue using his CPAP and lose

---

[8]Plaintiff suggests that the ALJ did not treat his sleep apnea as a severe impairment. It is clear, however, from the ALJ's findings that Plaintiff's sleep apnea was listed as a severe impairment in the findings and treated as such. (R. 14).

weight. (R. 115-116).  Finally, no issues with sleep apnea were noted by Plaintiff's primary care physician, Dr. Fruehling, in January 2006 or any time later. (R. 109-110, 213-214).

Plaintiff was treated for chest pain in August 2005 and was later diagnosed with hypertension, but there were no indications in the record that this placed any limitations on his physical ability.  Plaintiff had elevated blood pressure on several occasions but was placed on medication and had normal electrocardiograms, chest x-rays, and labs.  (R. 98, 110, 123-124, 130-131). He was concurrently treated for his pre-existing asthma with two types of inhalers. Significant limitations stemming from the asthma were absent from the treating physicians' records. In January 2006, Plaintiff reported to Dr. Freuhling that he was wheezing occasionally. In January 2007, Plaintiff reported using his short-acting inhaler twice a day. (R. 110).  The only complaints of actual limitations were to Plaintiff's treating psychologist, who was not qualified to deal with problems relating to Plaintiff's asthma.  In June and August 2007, Plaintiff reported to Dr. Fetchko that his asthma and breathing problems were limiting him. (R. 294, 299-300).  He failed to report any asthma problems to his primary care physician in July 2007 and cancelled a pulmonary function test, which was never rescheduled despite suggestions to do so. (R. 294,295-296).  Although Plaintiff reported at the hearing that his asthma caused him to be severely limited physically, this was not supported by his medical records or the findings of any of his doctors. The ALJ limited Plaintiff to the need to avoid concentrated exposure to dust, fumes, odors, and gases, which is a sufficient limitation to contend with Plaintiff's asthma.[9] (R. 19).

Additionally, the ALJ properly noted that the record did not support a finding that Plaintiff's obesity, taken alone or in conjunction with her other impairments, resulted in impairments that were disabling.  Plaintiff was noted as being 5'9" tall and between 310-315 through the course of his treatment. (R. 100, 315-318).  Plaintiff complained of occasional edema

---

[9] One of Plaintiff's remaining contentions is tied to this limitation.  Plaintiff argues that the ALJ erred in treating his inspector position as medium work.  In reality, however, the ALJ treated this position as light work, but concluded that Plaintiff could not return to that work because of environmental issues including dust. (R. 24-25).  The ALJ did not opine, as Plaintiff suggests, that Plaintiff was incapable of returning to the inspector position because it was light work.

of the feet due to his obesity and trouble walking up and down stairs due to leg pain. (R.60-64, 97). Plaintiff's podiatrist treated him for a common nail infection and prescribed custom orthotics for his flat feet. She did not opine that either of these problems were related to his obesity or resulted in any limitations whatsoever. In reality, Plaintiff presented to the podiatrist with a problem that he had successfully worked with for over thirty years. (R.101-102). No specific limitations on movement were noted by any of Plaintiff's other treating doctors either. In fact, the only significant notations regarding Plaintiff's obesity related to Plaintiff's failure to comply with the recommendations of several physicians that he attend a weight management program.

Finally, Plaintiff's records indicate treatment for hearing loss, vision prescription, and headaches. Despite Plaintiff's contentions otherwise, the ALJ did not err in treating these ailments as non-severe. "An impairment or combination of impairments is not severe if it does not significantly limit [the] physical or mental ability to do basic work activities." 20 C.F.R.§ 404.1521(a). The Commissioner's regulations define "basic work activities" to include, *inter alia,* "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b)(1). Plaintiff's hearing loss was treated with hearing aids and his hearing was reported as good in one ear and fair in the other with only mild to moderate hearing loss. (R. 104-105). His first hearing aids were received through his work at the chemical plant but had stopped working and he then received custom hearing aids from the Veteran's Administration. His audiologist indicated a good prognosis with the hearing aids and Plaintiff reported that "normal conversational speech was comfortable and easily understood" with the hearing aids. (R. 222). Except for losing his hearing aids on one occasion, there are no further notations in the record regarding problems with Plaintiff's hearing and he was wearing hearing aids at the hearing. (R. 215). As to Plaintiff's vision, he noted blurry vision on one occasion, but his optometrist indicated that his glasses prescription had not been changed in some time. He was given a new prescription and no further problems were noted. (R. 107-108). Plaintiff also reported headaches on three separate occasions but also indicated that they were successfully treated with either Motrin or ibuprofen. (R. 97, 295). There is no suggestion in the

record that any of these ailments affected Plaintiff's ability to do basic work activities.

Since the ALJ's finding that Plaintiff is capable of performing medium work with additional nonexertional limitations is supported by substantial evidence, 20 C.F.R. Pt. 404, Subpt P, App. 2, §202.00(c) would not demand a finding of disability. Section 202.00(c) states:

> However, for individuals of advanced age who can no longer perform vocationally relevant past work and who have a history of unskilled work experience, or who have only skills that are not readily transferable to a significant range of semi-skilled or skilled work that is within the individuals's functional capacity, or who have no work experience, the limitations in vocational adaptability represented by functional restriction to light work warrant a finding of disabled. Ordinarily, even a high school education or more which was completed in the remote past will have little positive impact on effecting a vocational adjustment unless relevant work experience reflects use of such education.

20 C.F.R. Pt. 404, Subpt P, App. 2, §202.00(c).  Plaintiff is of advanced age and his prior work was unskilled. 20 C.F.R. § 404.1563.  However, he fails to meet the requirement that he be capable of only light work since the ALJ properly determined that he is capable of medium work. Therefore, a finding of disabled is not mandated by this section.

The Act describes disability as the inability to engage in substantial gainful activity by reason of a physical or mental impairment that can be expected to last for a continuous period of at least twelve months.  The ability to engage in substantial gainful employment means more than the ability to do certain of the physical and mental acts required on the job; the claimant must be able to sustain the physical and mental demands of work-related activities throughout continuous attendance in a regular work week.  Dobrowolsky v. Califano, 606 F.2d 403, 408 (3d Cir. 1979). The question thus is not whether a claimant can perform activities consistent with substantial gainful activity on any particular day, but whether the claimant has the ability to engage in work activities on a systematic and sustained basis.  Plaintiff had the burden of making out a prima facia case that he was disabled within in the meaning of the Act.  Parker v. Harris, 626 F.2d 225, 231 (2d Cir. 1980); Livingston v. Califano, 614 F.2d 342, 345 (3d Cir. 1980); 20 C.F.R. § 404.1512(a). Here, the substantial evidence of records supports the findings that Plaintiff is capable of performing substantial gainful activity at the medium level. The ALJ appropriately dealt with Plaintiff's limitations in his RFC assessment. Since all of the limitations included in

the ALJ's RFC assessment were also present in the hypothetical to the VE, the ALJ did not err in not including other, unspecified limitations in the hypothetical.  Accordingly, the ALJ's findings and conclusions reflected a determination that Plaintiff was not disabled and this conclusion was supported by substantial evidence.  As a result, Plaintiff's motion for summary judgment must be denied and the Commissioner's motion for summary judgment must be granted.

An appropriate order will follow.


Date: March 8, 2010


                                                s/ David Stewart Cercone
                                                David Stewart Cercone
                                                United States District Judge


cc:      Zenford A. Mitchell, Esquire
         P.O. Box 99937
         Pittsburgh, PA 15233

         Lee Karl
         Assistant United States Attorney

24